B. Lance Entrekin (#016172)
**The Entrekin Law Firm**
One East Camelback Road, #710
Phoenix, Arizona 85012
Telephone: (602) 954-1123
Facsimile: (602) 682-6450
E-mail: lance@entrekinlaw.com

Shanon J. Carson
Glen L. Abramson
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: scarson@bm.net
        gabramson@bm.net
(Application for Pro Hac Vice Admission Pending)

Gregory F. Coleman
Lisa A. White
**GREG COLEMAN LAW PC**
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, TN  37902
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
Email: greg@gregcolemanlaw.com
        lisa@gregcolemanlaw.com
(Application for Pro Hac Vice Admission Pending)

Attorneys for Plaintiff and the Putative Classes

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| ROCKY E. WYBLE, individually and on behalf of all others similarly situated, | NO. |
| Plaintiff, | **COMPLAINT** |
| v. | **(Jury Trial Requested)** |
| FLUIDMASTER INC., a California corporation, | |
| Defendant. | |

Page 1 of  47

Plaintiff Rocky E. Wyble ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Fluidmaster, Inc. ("Fluidmaster" or "Defendant"). In support thereof, Plaintiff alleges as follows based upon personal knowledge as to his own conduct and on information and belief as to the acts of others.

## NATURE OF THE ACTION

1.      Fluidmaster manufactures and markets a line of braided steel supply lines known as Fluidmaster NO-BURST® braided stainless steel supply lines (hereinafter, the "Braided Lines" or the "NO-BURST Lines") used to supply both hot and cold water to common household fixtures including kitchen and bathroom faucets, toilets and dishwashers.

2.      This lawsuit arises out of damages sustained by Plaintiff and the Class that were proximately caused by Fluidmaster's defective NO-BURST Lines.

3.      Plaintiff brings this class action against Fluidmaster on behalf of himself and all individuals and entities that own or have owned Fluidmaster NO-BURST Lines or who own or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class").

4.      Fluidmaster pursued an aggressive branding and marketing strategy with respect to its Braided Lines, stating that they are of high quality, built with superior materials and only sold after rigorous testing. Fluidmaster advertises its Braided Lines as "tough," "heavy-duty," "NSF approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength." For over two decades, Fluidmaster has sold its Braided Lines under the registered trademark, NO-BURST®.

5.      Notwithstanding the name of the product, because of defective design and poor material selection, Fluidmaster's NO-BURST® Lines routinely and catastrophically fail in various ways. These failures can be categorized into two major groups: a) "Bursts" and b) "Breaks." Upon information and belief, all of the defective NO-BURST Lines may be equally likely to burst or break, but no line fails in both ways. The first failure renders

the line useless.

6. "Bursts" of the Fluidmaster Lines occur when the outer braided steel reinforcement corrodes, thereby exposing an inner tubing, which is of insufficient strength to withstand water flow even at ordinary pressures. The inner tubing eventually ruptures and bursts. The Braided Lines burst because Fluidmaster uses an inferior grade of stainless steel that is susceptible to corrosion from everyday household cleaners that are expected to be used and stored in close proximity to the Braided Lines as they are intended to be used. Fluidmaster used inadequate low-pressure flexible rubber tubing that easily bursts when the stainless steel braiding corrodes and breaks from ordinary exposure to water, air, and household products.

7. "Breaks" of the Fluidmaster's NO-BURST lines routinely occur at the polymeric "acetal" coupling nut, even when properly installed and hand tightened. The design of the coupling nut is prone to fracturing and eventually failing.

8. The defects in the Fluidmaster NO-BURST Braided Lines are so severe that Plaintiff and Class members must replace and discard their Braided Lines sooner than reasonably expected. Far from the dependable, heavy-duty parts that Fluidmaster represents them to be, the defective Braided Lines are inevitable failures waiting to happen, with the potential to cause a range of damages including catastrophic flooding and property destruction.

9. Plaintiff and the Class have suffered harm as a result of Fluidmaster's actions because their Braided Lines contained a material design defect which caused the Braided Lines to rupture and burst, or alternatively break at the coupling nut, causing harm not only to the Braided Lines, but also to other real and personal property. In addition, because of the flooding that actually has or will occur due to the defects described herein, there is a serious risk of harm in the event the flooding takes place in areas where electrical outlets, appliances, and related household items could cause electrocution to anyone who may come into contact with or near those items as water is an electrical conductor. Plaintiff's and Class members' damages also include the loss of the benefit of the bargain, in that they paid for a product that was worth less than what was represented by Fluidmaster, and Plaintiff and the Class would not have purchased the braided lines had they known of the defect at the time of sale. Finally, Plaintiff and Class members risk the diminution in the

value of their property as a result of water damage.

10.     Upon information and belief, in an attempt to correct the design defect alleged herein, Fluidmaster changed the design of its NO-BURST Lines in or around 2003 to include higher pressure-rated inner water-carrying tubing such that if the exterior stainless steel braiding support was lost, the supply line would not rupture, or would not rupture as easily. In addition, the company redesigned its coupling nut in or about 2003 to reduce the likelihood of failure at that connection.  These attempted corrections did not work.

11.     Thousands of NO-BURST Lines which include both the defective designs and defective materials are still being sold by distributors and stores known to Fluidmaster, and are still being installed in residential and commercial buildings across the country.

12.     Despite Fluidmaster's numerous representations regarding the high quality and dependability of its NO-BURST Lines, Fluidmaster knows and has known of the design defects alleged herein and that there was a substantial risk that its NO-BURST Lines would burst, leak, break, or otherwise fail.  Fluidmaster has failed to disclose that risk to consumers.

13.     Plaintiff seeks to recover, for himself and the Class, all costs associated with repairing, removing and/or replacing his Braided Lines, as well as the costs of repairing any damage to his property caused by the failure of the Braided Lines to perform as represented and warranted.  Plaintiff also seeks injunctive relief requiring Fluidmaster to modify its unfair and fraudulent practices so as to uniformly provide relief in accordance with its obligations under the law.

**PARTIES**

**Plaintiff Rocky E. Wyble**

**14.**     Plaintiff Rocky E. Wyble is an adult individual who resides in and is a citizen of Mesa, Arizona.

15.     In or about 2010, a plumber installed a Fluidmaster NO-BURST Braided Toilet Supply Line in Mr. Wyble's master bathroom, which is located on the second floor of his home.

16.     In the early morning hours of July 16, 2014, the coupling nut of Plaintiff Wyble's Fluidmaster Braided Line broke and flooded the master bedroom and bathroom,

as well as flooding through to the main level of the home. On the main level of the home, the Wybles suffered damages to their ceilings, walls, kitchen cabinets, flooring, and to the structure of his home. Although the repairs are still underway and the total damages are still being calculated, Mr. Wyble estimates that his real and personal property sustained over $50,000.00 in property loss, repairs and damages, including the destruction of the actual braided water line.

17. The flooding to Mr. Wyble's home included damage to various electrical fixtures, including but not limited to ceiling light fixtures. In addition, the kitchen flooding was in the proximity of his electrical kitchen appliances, placing Mr. Wyble and his family at risk of electrocution upon discovering the home's flooding prior to shutting off their electricity.

18. Since the flooding of his home, Mr. Wyble and his family have been forced to reside in a hotel while their home is being repaired and renovated. The length of time that they will be displaced from their home is uncertain.

19. Mr. Wyble notified his homeowner's insurance company, who indicated that they would contact Fluidmaster regarding the Wybles' Braided Line failure. Upon information and belief, to date Fluidmaster has failed to adequately address the damages that Mr. Wyble incurred as a result of the failure of his NO-BURST Braided Line through any subrogation of his insurance claims.

20. Mr. Wyble would not have had the Fluidmaster Braided Line installed in his home, exposing his real and personal property to flooding and exposing himself and his family to safety risks, had Fluidmaster disclosed the propensity for the Braided Line's coupling nut to spontaneously break and fail.

**Defendant Fluidmaster, Inc.**

**21.** Defendant Fluidmaster, Inc. ("Defendant" or "Fluidmaster") is a California corporation with its corporate headquarters and principal place of business located at 30800 Rancho Viejo Road, San Juan Capistrano, California 92675. Fluidmaster conducts substantial business in Arizona and throughout the United States, including the sale and distribution of its NO-BURST® Braided Lines, which can be purchased at stores such as Home Depot, Lowe's, Menards, TrueValue, Walmart, and Ace Hardware.

## JURISDICTION AND VENUE

**22.** This Court has jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), as this matter is brought as a class action under Rule 23 of the Federal Rules of Civil Procedure. Moreover, there are more than 100 Class Members residing in multiple states, and the amount in controversy exceeds Five Million Dollars ($5,000,000.00). The requirement of minimal diversity is met as the dispute is between citizens of different states. Plaintiff Wyble is a citizen of Arizona and Defendant Fluidmaster is a citizen of California.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391, *et seq*. because a substantial part of the events or omissions giving rise to the claim occurred in this District. Additionally, Defendant Fluidmaster regularly conducts substantial business in Arizona, including the sale and distribution of its NO-BURST® Braided Lines.

## SUBSTANTIVE ALLEGATIONS

**24.** Fluidmaster, a corporation that conducts business throughout the United States, designed, manufactured, assembled, tested, labeled, marketed, advertised, and offered for distribution and sale defective Braided Lines with the specific purpose that they be installed by builders, plumbers and consumers in homes and other buildings throughout the United States. These Braided Lines were designed and introduced as a safe and superior alternative to rigid metal pipes with shutoff valves. With their safety features ("NO-BURST"), these braided lines were lauded as safe products which are of merchantable quality, and fit for their intended and reasonably foreseeable uses.

25. Braided stainless steel supply lines are used to transport water from a supply pipe to a plumbing fixture (*e.g.*, a toilet, faucet, dishwasher, *etc.*). The lines primarily consist of three parts: the inner flexible tubing, the outer braided steel wire designed to protect it, and the coupling nuts which connect the lines to adjacent plumbing fixtures. Because they can be installed in tight spaces, braided stainless steel supply lines have found widespread application in residential and commercial plumbing.

26. Fluidmaster, however, knowingly failed to disclose that its NO-BURST Braided Lines were subject to a serious design defect, were unsafe, and posed a substantial risk of failure, in that they would rupture and burst resulting in flooding and damaging building owners' real and personal property. Even after their Braided Lines began failing,

Fluidmaster failed to notify consumers of the defects.

27.     In recent years, losses due to water leaks, flooding, and mold damage caused by faulty and defective supply lines have risen.  Because the water being transported is under pressure, deterioration of the stainless steel braiding due to corrosion can cause the lines to become brittle and burst, even under normal pressure conditions and absent any faulty installation and/or misuse by the consumer.

28.     In addition, in the early 1990s, Fluidmaster began manufacturing the NO-BURST Braided Line with coupling nuts which were manufactured from less expensive acetal plastic rather than metal.

29.     Although Fluidmaster promoted its plastic coupling nuts as "heavy duty" and "durable and easy to grip" for installation, the plastic coupling nuts regularly suffer from a circumferential fracture and cause the NO-BURST Braided Lines to fail, flooding the property of consumers.

30.     On Fluidmaster's website, visitors find a picture of the Company's founder, Adolf Schoepe, who the website claims changed the plumbing industry in 1957 when he invented the famously dependable Fluidmaster toilet fill valve.[1]  Visitors also find a number of claims regarding the allegedly high-quality materials that Fluidmaster products are made from and the allegedly long, useful, lifespan customers can expect from them:

> Why do Fluidmaster parts last so long?  Superior engineering and top-grade materials.  We keep that spirit of invention alive by always looking (and finding) new ways to make our repair parts work better and last longer.

http://www.fluidmaster.com/history

31.     Fluidmaster describes how its toilet valves (the Company's flagship product) are subjected to rigorous testing, including tests meant to simulate exposure to water with extreme pH or chlorine levels:

> Fluidmaster's team of engineers oversees a rigorous product testing program, exposing valves to conditions that greatly exceed typical household circumstances.  Up to 20 valves cycle 24-hours a day in the Engineering Lab,

---

[1] http://www.fluidmaster.com/history

> sometimes flushing water that is altered to simulate the
> extreme pH or chlorine levels that exist in other regions. To
> maintain a competitive stance, Fluidmaster also regularly tests
> valves from other manufacturers, using the same demanding
> protocol.

http://fluidmasterpro.com/history

32. Fluidmaster describes how "[t]he popularity of [its] valves has created a perfect springboard for Fluidmaster's expansion into related product lines," such as braided stainless steel connectors/supply lines, explaining in detail:

> In addition to the inaugural fill valve, Fluidmaster's complete line
> of toilet repair parts includes flush valves, flappers, tank levers, dual flush
> valves, bowl wax, toilet repair kits, ballcocks and connectors.
> Fluidmaster's growing global distribution network reaches more than 80%
> of the world's population and spans over 87 countries. With manufacturing
> facilities across the globe, Fluidmaster is quick to market, quick to
> manufacture and *quick to deliver with unparalleled quality assurance.*

(Emphasis added).[2]

33. To reassure consumers of the outstanding quality of their products, Fluidmaster's marketing materials emphasize their vast market share, which has resulted from providing the "highest quality" products:

Fluidmaster is the #1 selling brand of toilet repair products in the world. In fact, our products are found in more toilets than all other brands combined. For more than 50 years, Fluidmaster has been at the forefront of the toilet care market by providing innovative yet easy-to-use products that are of the highest quality.

34. Fluidmaster's marketing is clear and unambiguous -- consumers can depend on the Company's products, including its NO-BURST® Braided Lines, because they are "of the highest quality," they are made of superior materials, and their products are rigorously tested before finding their way into homes across the world.

**A. Fluidmaster's NO-BURST® Lines**

**35.** Fluidmaster manufactures a line of braided stainless steel supply lines under the

---

[2]http://fluidmasterpro.com/history/

registered trademark "NO-BURST®" that are the subject of this lawsuit.

36.    Fluidmaster began using the "NO-BURST" designation in the 1980s and registered the trademark in 1989.

37.    Fluidmaster's NO-BURST Lines typically retail for between $2.00 to $20.00, depending on the length of the line and the type of fixture.  The specific line of products that are the subject of this lawsuit is set forth below:

a) NO-BURST® Braided Stainless Steel Fluidmaster Supply and Toilet Supply Lines

6", 9", 12", 16" and 20"

b) NO-BURST® Braided Stainless Steel Fluidmaster Supply Lines (with re-enforced vinyl)

6", 9", 12", 16" and 20"

c) NO-BURST® Braided Stainless Steel Faucet Connectors

9", 12", 16", 20", 30" and 36"

d) NO-BURST® Braided Stainless Steel Dishwasher Connectors

48"

e) NO-BURST® Braided Stainless Steel Ice Maker Connectors

12", 60", 72" 84", 96", and 120"

f) NO-BURST® Braided Stainless Steel Washing Machine Connectors

48", 60" and 72"

g) NO-BURST® Braided Stainless Steel Water Heater Connectors

12", 18" and 24"

38.    Fluidmaster's NO-BURST Lines are easily identifiable, as the Company's name and part number are stamped or etched onto the crimp sleeve located at the end of the line.  For example, a line might be stamped "#FLUIDMASTER USA W222#."

39.    Fluidmaster advertises its NO-BURST Lines as "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high

bursting strength."

1
2
3          40.  For example, Fluidmaster's NO-BURST Lines are described as follows on its
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

website: NO-BURST® Braided Stainless Steel Fluidmaster Supply Lines High bursting strength. Each foot of No-BURST® connectors contains 220 feet of stainless steel wire. Stainless ferrules are extra-long with double radial crimps for more security. Tough, NSF-approved, re-enforced polymer core resists chlorine and chloramines. Ample inside diameter for high flow capacity. Captive cone washes seal tightly.

Exceptional flexibility for fast, easy installation. Won't kink or crease, even in the tightest of spaces. Heavy-duty brass nuts are durable and easy to grip.

Exceeds all requirements for flexible water connectors.

41. On its website, Fluidmaster also provides a series of "Appliance Maintenance Tips." Fluidmaster instructs consumers to inspect water supply connectors annually and "[r]eplace if bulging or unable to straighten out any kinks." For best results, consumers are told to "replace with a braided, flexible stainless steel connector such as NO-BURST®."

42. Fluidmaster does not instruct its customers to inspect their NO-BURST Lines for signs of corrosion or warn them of the Braided Lines' susceptibility to corrosion, rupture, bursting or breaking.

**B. Fluidmaster's Warranty**

**43.** Fluidmaster provides either a five-year -- or, in some cases, depending on the date of manufacture, a ten-year -- limited express warranty on each of its NO-BURST Lines.[3] Pursuant to the standard warranty, Fluidmaster promises to repair or replace "any part which proves to be defective in workmanship or materials" under normal use for five (5) years from the date of purchase.

44. The warranty is made subject to the following "Exclusions":

FLUIDMASTER SHALL NOT BE LIABLE FOR INCIDENTAL OR
CONSEQUENTIAL DAMAGES, INCLUDING COSTS OF
INSTALLATION, WATER DAMAGE, PERSONAL INJURY OR FOR ANY
DAMAGES RESULTING FROM ABUSE OR MISUSE OF THE
PRODUCT, FROM OVERTIGHTENING OR FROM FAILURE TO

INSTALL OR MAINTAIN THIS PLUMBING PRODUCT IN

---

[3] http://www.fluidmaster.com/warranty

ACCORDANCE WITH THE WRITTEN INSTRUCTIONS.  DO NOT USE

IN-TANK DROP-IN TOILET BOWL CLEANERS CONTAINING BLEACH

OR CHLORINE.  USE OF SUCH PRODUCTS WILL RESULT IN

DAMAGE TO TANK COMPONENTS AND MAY CAUSE FLOODING

AND PROPERTY DAMAGE.  USE OF SUCH PRODUCTS WILL VOID

THIS WARRANTY.

**C. Fluidmaster's NO-BURST® Lines Are Defective**

**45.** At all times relevant to this Complaint, and prior to the purchase by Plaintiff and the Class members of their Braided Lines, Fluidmaster was aware that its Braided Lines contained an inherent design defect that caused them to burst, rupture, leak, and fail, and that the defect was present at the point of sale.

46.  Fluidmaster knew, or but for its reckless indifference should have known, that it was receiving and was going to continue to receive reports of burst and broken NO-BURST Lines.

47. Despite its knowledge, Fluidmaster did not disclose to its customers or prospective purchasers that there was a substantial risk that its NO-BURST Lines would manifest the defect (rupture and bursting of the inner tubing on the lines after corrosion of the stainless steel braiding and/or the failure of the braided line's coupling nut).

48. Consumers who purchased the NO-BURST Braided Lines had no way of knowing that the lines were defective at the point of sale.

49.  Fluidmaster's NO-BURST Lines are defective because they do exactly what they are not supposed to do: they burst.  The defect is a design flaw stemming from Fluidmaster's use of substandard materials.

50.  Specifically, Fluidmaster uses a grade of stainless steel that is known to corrode and fracture in the presence of low levels of bleach or chlorine, chemicals that are present in common household cleaners that are reasonably and foreseeably used and stored near NO-BURST Lines.

51.  Additionally, Fluidmaster used a low pressure-rated water-carrying inner tubing that herniates and ruptures if support from the exterior stainless steel braiding is lost.

52. NO-BURST Lines using defective materials, however, are still being sold and installed in residential and commercial buildings across the country.

53.  Although a layperson might believe that stainless steel cannot corrode, this is

inaccurate. When stainless steel is exposed to oxygen, a microscopic layer of corrosion forms almost immediately over its entire surface, sealing the steel from further oxidation and stopping further corrosion. If stainless steel is scratched or scraped, the protective layer is lost, but will reform again to "heal" the exposed area.

54. The braided stainless steel covering of a supply line pulsates and moves with changes in water pressure and as a result of a phenomenon known as water hammer, which occurs when flowing water is forced to stop or change direction suddenly, as when a valve is closed at the end of a pipeline system, causing a knocking sound. This movement causes the braid's wires to rub against one another, and the protective coating of corrosion on the surface of the stainless steel is lost and reformed over and over again.

55. Unlike solid rubber or copper tubing, the braided nature of the surface stainless steel supply lines allows them to capture water. The water and any chemical it contains seeps through the braid and is trapped between the braid and the inner flexible tubing. If the water contains chlorides found in common household cleaners, the corrosion that happens as the braid moves is accelerated. This process, which will eventually cause the braiding to fail and the line to burst, is known as chloride stress corrosion.

56. Under normal and foreseeable conditions, the outer stainless steel shell of Fluidmaster's NO-BURST Lines deteriorates, making it thin and brittle, causing the braiding to separate, exposing the inner flexible tubing, and causing it to lose strength.

57. When this happens, normal water pressure allows the low-pressure tubing to herniate until it ruptures, resulting in an uncontrolled release of water. See pictures of ruptured lines:

 

58. Chloride stress corrosion is a well-known and generally accepted phenomenon

by the scientific community and in the plumbing industry. Fluidmaster knew or was reckless in not knowing that by selecting an inferior grade of stainless steel, combined with low-pressure inner rubber tubing, it was creating a product designed to fail. These defects were present at the time of manufacture and point of sale to Plaintiff and the Class, who did not have knowledge of the defects.

59. Additionally, certain Fluidmaster NO-BURST Lines are connected to the adjacent plumbing fixture with a polymeric "acetal" (or in layman terms, plastic) coupling nut which was manufactured and/or distributed by Fluidmaster.

60. The coupling nut fractures due to fatigue loading (i.e., repetitive cycling of a load through normal use) and an improper design with sharp edges that are susceptible to fracture. As a result, small fractures progress through ordinary use and vibrations, leading to failure of the coupling nut itself.



61. Fluidmaster selected "acetal" for the plastic coupling nut material. This material is particularly susceptible to fractures, especially when the design includes sharp corners, like those found in the threads of the coupling nut in the NO-BURST Braided Lines.

62. Despite Fluidmaster's claims of durability and heavy-duty craftsmanship, the coupling nuts on its NO-BURST Braided Lines fail to adhere to the design standards in the plastics industry. Under stress, polymer molecules in plastics "relax." If the stresses to the plastic component are minimal, the component will deflect and rebound. However, if the plastic component is subjected to long term stresses, like those from constant pressure or tightening, the component begins to fracture and eventually fails altogether without warning to the unsuspecting consumer.

63. The design defect in Fluidmaster's coupling nut on its braided lines is present at the time of manufacture and at the point of sale to Plaintiff and the Class, who are not aware of the design defects nor are forewarned of the consequences of fractures and failure of the coupling nut.

**D.      Inadequate Labeling and Warnings**

**64.**  Fluidmaster had a duty to adequately design its NO-BURST Lines to keep from rupturing and bursting and to provide warnings as to how they could burst because of their defective nature.  Specifically, the label fails to warn that the NO-BURST Lines will burst due to the "stress corrosion" process described above.

65. Likewise, Fluidmaster fails to warn consumers of the likelihood of failure of the acetal coupling nut. Although the lines warn "DO NOT OVERTIGHTEN" and "HAND TIGHTEN ONLY," these vague instructions leave the installer to decide

how tight is "tight enough" but not "too tight."

66.  By 2007, Fluidmaster was aware that its installation instructions and warnings were vague and ambiguous, and that at least 390 plastic coupling nut failures of its Braided Lines resulted from over-tightening of the nut during routine installation. *See USAA Casualty Ins. Co. v. Fluidmaster, Inc.*, Case No. 06-CC-10212.

67.  The label also fails to identify the gravity of the hazards that can result from the bursting of the line and that such failure is likely to cause water damage, flooding, and even catastrophic flooding.  The label contains no warnings regarding how to avoid these risks, and no disclosure that after the warranty period the lines should be replaced or they may fail.

68.  Without proper warnings, Plaintiff and the Class were left on their own to determine whether their Braided Lines were about to fail as a result of their design defect. The reasonable expectation of a consumer of the Braided Lines is that the life expectancy of a properly designed supply line connected to a toilet, for example, will equal or surpass that of the toilet (15 years of average life expectancy), unless warned or informed by the manufacturer otherwise.

**E.**     **Fluidmaster Changed the Design of the NO-BURST Braided Lines**

**69.**  Upon information and belief, in an attempt to correct the design defect alleged herein, in or around 2003 Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating.  Upon information and belief, Fluidmaster strengthened the water-carrying inner tubing to reduce or

delay the bursting of the tubing should the exterior stainless steel braiding support be lost to corrosion.

70. Additionally, Fluidmaster re-designed its acetal coupling nuts, and upon information and belief, began manufacturing the coupling nuts using glass-reinforced polypropylene, a material which is high in strength, stiffness, and resistant to impacts. Futhermore, these coupling nuts were redesigned to reduce the sharp transitions within the plastic coupling nut which are significantly more prone to fracturing than rounded transitions.

71. Upon information and belief, as early as 2003, Fluidmaster remedied some of the defects of its NO-BURST Braided Lines by incorporating stronger inner tubing and selecting a stronger material for its plastic coupling nut. However, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break. Fluidmaster also did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

72. Upon information and belief, instead of notifying consumers of the known defects of its NO-BURST Braided Lines, Fluidmaster reduced its warranty from ten years to five years.

73. Thus, at all times which are material to this matter, and at times prior to the damages suffered by the Plaintiff and Class Members, Fluidmaster knew that: a) the risk of the failure of its NO-BURST Braided Lines was substantial due to the Line's

defective design and material selection; b) Plaintiff and Class Members were unaware of the substantial risk that the NO-BURST Braided Lines would burst or break; c) Plaintiff and Class Members had a reasonable expectation that Fluidmaster would disclose the risk and cure the defects of their product; and d) Plaintiff and Class Members were unaware that their Braided Lines should be replaced to avoid sudden catastrophic failure of the NO-BURST Braided Lines or that they had a useful life that was shorter than their stated warranty period.

**F.      Plaintiff and the Class Suffered Damages**

**74.**  Plaintiff and the Class have suffered harm as a result of Fluidmaster's actions because their Braided Lines contained a material design defect which caused the Braided Lines to rupture and burst, or alternatively break at the coupling nut, causing harm not only to the Braided Lines, but also to other real and personal property. In addition, because of the flooding that actually has or will occur due to the defects described herein, there is a serious risk of harm in the event the flooding takes place in areas where electrical outlets, appliances, and related household items could cause electrocution to anyone who may come into contact with or near those items as water is an electrical conductor.

75.  Plaintiff and the Class had a reasonable expectation that the service life of the NO-BURST Braided Lines was at least 15 years (in fact, a competitor named Floodchek has a 20-year warranty on Braided Lines such as the ones sold by Fluidmaster in this case),[4] which would equate to the same useful life as the plumbing component (*e.g.*, toilet) to which it was affixed.

---

[4]http://www.floodchek.com/resources/braided-wire-washer-hose.html

76. The Braided Line design defect, however, caused Plaintiff and the Class members' Braided Lines to experience premature failure that is disproportionate to the age of the component or to the age of the plumbing fixture (*e.g.*, toilet, faucet, etc.).

77. The injuries sustained by Plaintiff and the Class flow directly from the core common facts surrounding Fluidmaster's misconduct, including, without limitation: (a) that the Braided Lines suffered from a design defect which was known to Fluidmaster that led the lines to rupture and burst or for the coupling nut to fail; (b) that the Braided Lines were defective for their intended use at the time of sale; (c) that Fluidmaster did not provide adequate warnings concerning the defective nature of the Braided Lines; and (d) that Fluidmaster, despite knowing of the design defects, failed to provide any public notice or warning, or institute a recall to repair or replace the defective Braided Lines.

78. Plaintiff's and Class members' damages include, without limitation: (a) amounts paid for the defective Braided Lines; (b) amounts paid to remediate real and personal property damage caused by flooding after the failure of a Fluidmaster Braided Line; (c) amounts paid to replace the defective Braided Lines; and (d) expenses incurred on incidental and consequential damages. Plaintiff and the Class also lost the benefit of the bargain with respect to their purchase of the Braided Lines in that they would not have purchased them if they had they known of the defects that existed at the point of sale, or they would not have paid the price they paid, wrongly believing that the Braided Lines were not defective. In addition, there is a serious risk of harm to Plaintiff or members of the Classes if they come into contact with any

electrical outlet, appliance or related item, as water flooding from the defective lines is a conductor of electricity.

79. Plaintiff, through online and related research, has found many complaints concerning the problems and defects outlined herein have occurred across the country, and in fact numerous insurance companies have filed suit against Fluidmaster for their defective braided lines in order to recover monies paid by the insurance companies to various homeowners for flooding and related property damage.

**FRAUDULENT CONCEALMENT**

**80.** At all relevant times, Fluidmaster affirmatively concealed from Plaintiff and the Class the design defect inherent in the Braided Lines.

81. Fluidmaster had a duty to inform Plaintiff and the Class of the defect, about which Fluidmaster knew or should have known. Specifically, Fluidmaster has known for years of the problems and defects outlined herein through various complaint forums and as the result of numerous suits being filed against Fluidmaster by various insurance companies. Notwithstanding their duty to inform Plaintiff and class members, Fluidmaster has never disclosed the defect to Plaintiff and the Class. To the contrary, Fluidmaster has consistently maintained that its Braided Lines are "NO-BURST," "tough," "heavy-duty," "NSF-approved," "reinforced," chlorine resistant, designed for "high flow capacity" and having "high bursting strength."

82. Plaintiff and the Class could not have discovered the defect or Fluidmaster's attempts to avoid disclosure of the defects alleged herein. Thus, the running of the applicable statutes of limitation have been tolled with respect to any

claims that Plaintiff or the Class members have brought or could have brought as a result of the unlawful or fraudulent course of conduct described herein.

83.  In addition, Fluidmaster is estopped to plead the statute of limitations because it failed to disclose facts that it was obligated to disclose concerning the concerning the defects in the NO-BURST Braided Lines.  Fluidmaster actively concealed and misrepresented to Plaintiff and the Class members facts that were essential to understanding that Plaintiff and the Class members had claims against Fluidmaster, and Fluidmaster thus acted to prevent Plaintiff and the Class members from learning that they possessed claims against Defendant.  Had Plaintiff and the Class members been aware of the facts which Fluidmaster misrepresented and concealed, they would have commenced suit against Fluidmaster before the running of any statute of limitations alleged to be applicable to this case.

84.  Fluidmaster is further estopped from asserting any statute of limitations defense, contractual or otherwise, to the claims alleged herein by virtue of its fraudulent concealment.

## CLASS ACTION ALLEGATIONS

**85.**  This action is brought and is properly maintained as a nationwide class action pursuant to FED. R. CIV. P. 23 on behalf of a class defined as follows:

> All individuals and entities that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in the United States, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Class"). Excluded from the Class is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

86. Alternatively, or in addition to the nationwide Class claims, Plaintiff brings these claims under FED. R. CIV. P. 23 on behalf of himself and on behalf of a Class of individuals and entities residing in Arizona (the "Arizona Class"), as follows:

> All individuals and entities in Arizona that own or have owned Fluidmaster NO-BURST Lines; or who own or have owned homes or other structures physically located in Arizona, in which Fluidmaster NO-BURST® braided stainless steel supply lines are or were installed (the "Arizona Class"). Excluded from the Arizona Class is Fluidmaster, any entity in which Fluidmaster has a controlling interest, and Fluidmaster's legal representatives, assigns and successors.

87. The Nationwide Class and the Arizona Class are collectively referred to herein as the "Class."

88. Plaintiff reserves the right to redefine the Class prior to the certification of the Class.

89. The Class is so numerous that individual joinder of all Class members is

impracticable. The actual number of Class members is unknown at this time, but numbers in the hundreds or thousands. The true number of Class members is likely to be known by Fluidmaster and may be ascertained through its books and records, and through discovery of its retailers and distributors.

90. There are numerous questions of law and fact that are common to Plaintiff and the Class and that predominate over any questions that may affect individual Class members, including, without limitation:

a.    Whether Fluidmaster's Braided Lines are defective;

b.    Whether Fluidmaster's Braided Lines suffer from common design defects;

c.    Whether the design defects with respect to Fluidmaster's Braided Lines result in the Braided Lines being prone to rupture, burst, break, and result in failure to perform the task for which they were designed;

d.    Whether Fluidmaster knew or should have known of the defects in the Braided Lines prior to putting them into the stream of commerce for purchase by Plaintiff and the Class;

e.    Whether Fluidmaster properly advised consumers about the likelihood of the Braided Lines' premature failure;

f.    Whether Fluidmaster owed a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacture, warranting and marketing of the Braided Lines;

g.    Whether Fluidmaster breached its duty to Plaintiff and the Class by designing, manufacturing, advertising and selling to Plaintiff and the Class defective

Braided Lines;

h.  Whether Fluidmaster breached its duty to Plaintiff and the Class by failing promptly to remove the defective Braided Lines from the marketplace or take other remedial action;

i.  Whether the Braided Lines fail to perform in accordance with the reasonable expectations of ordinary consumers;

j.  Whether the Braided Lines fail to perform as advertised, marketed and warranted;

k.  Whether Fluidmaster breached its express warranties to Plaintiff and the Class by advertising, marketing and selling defective Braided Lines to Plaintiff and the Class;

l.  Whether Fluidmaster breached its implied warranties to Plaintiff and the Class by advertising, marketing and selling Braided Lines that were not of a merchantable quality, nor fit for the ordinary purpose for which they were sold;

m.  Whether Plaintiff and the Class are entitled to compensatory damages, and the amount of such damages for the replacement and remediation of the Braided Lines;

n.  Whether Fluidmaster's representations regarding the suitability and exemplary nature of its Braided Lines, and its omissions and concealment of facts to the contrary regarding the Braided Lines' design defect constitute violations of consumer protection laws;

o.  Whether Fluidmaster continued to market and sell the defective Braided Lines under the name "NO-BURST" when the manufacturer knew that the Braided

Lines would spontaneously burst or break, causing damage to the property of consumers;

        p.    Whether Fluidmaster has been unjustly enriched by its conduct, as alleged herein; and

        q.    Whether Fluidmaster should be required to notify all Class members about their defective Braided Lines.

91. Plaintiff has the same interests in this matter as all Class members, and his claims are typical of all Class members. As a result of the uniform design defects inherent in the Braided Lines' formulation, the Braided Lines have failed and will continue to prematurely fail, causing Plaintiff and Class members to suffer damages in the form of unreimbursed costs associated with replacing the Braided Lines and remediating flood damage.

92. Plaintiff will fairly and adequately represent the interests of the Class members and does not have interests adverse to the Class. Plaintiff is committed to pursuing this action and has retained competent counsel. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the financial resources to do so.

93. Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendant, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

94. Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(2) because

Defendant has acted or refused to act on grounds generally applicable to the Class, making appropriate both declaratory and injunctive relief with respect to the Class as a whole. The members of the Class are entitled to injunctive relief as set forth below.

95. Class certification is appropriate pursuant to FED. R. CIV. P. 23(b)(3) because, as set forth above, questions of law and fact common to the Class predominate over questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Furthermore, the likelihood that individual members of the Class will prosecute separate actions is remote given the extensive time and considerable expense necessary to conduct such litigation, especially when compared to the relatively modest amount of damages at issue for each individual Class member. This action will be prosecuted in a manner to ensure the Court's able management of this case as a class action, and Plaintiff know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

### FIRST CAUSE OF ACTION

### Violation of Similar Uniform Deceptive Trade Practices Acts

### On behalf of the Class

**96.** Plaintiff incorporates by reference each of the foregoing allegations.

97. The Arizona Consumer Fraud Act ("the Act")(Ariz. Rev. Stat. § 44-1521, *et seq.*) was in full force and effect during the relevant time period applicable to this Complaint. Similar statutes, in their material respects, are in effect in many jurisdictions

within the United States.[5]

98. Plaintiff and the Class are consumers within the meaning of the Act given that Fluidmaster's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

99. NO-BURST Braided Lines are goods within the meaning of the Act. Fluidmaster is engaged in trade or commerce within the meaning of the Act.

100. The consumer fraud statutes and/or interpretive case law of Arizona's sister states have also either: (a) expressly prohibited omissions of material fact, without regard for reliance on the deception; or (b) have not addressed those issues.

101. Fluidmaster has engaged in unconscionable, deceptive, and/or unfair practices within the meaning of the Act when it sold NO-BURST Lines that they knew contained material defects and that these lines would fail under normal use.

102. Once Fluidmaster knew of the risks of the design defect inherent in the Braided

---

[5] Ariz. Rev. Stat. § 44-1521, *et seq.*; Ark. Code Ann. § 4-88-107, *et seq.*; Cal. Bus. Prof. Code § 17200, *et seq.*; Colo. Rev. Stat. § 6-1-101, *et seq.*; Conn. Gen. Stat. § 42-110b, *et seq.*; Del. Code Ann. tit. 6, § 2511, *et seq.*; D.C. Code Ann. § 28-3901, *et seq.*; Fla. Stat. Ann. § 501.201, *et seq.*; Idaho Code § 48-601, *et seq.*; 815 Ill. Comp. Stat. 505/2, *et seq.*; Ky. Rev. Stat. Ann. § 367.110, *et seq.*; La. Rev. Stat. Ann. tit. 15, § 1401, *et seq.*; Me. Rev. Stat. tit. 5, § 205-A, *et seq.*; Mich. Stat. Ann. § 19.418(1), *et seq.*; Minn Stat. § 8.31, *et seq.*; Mo. Rev. Stat. § 407.010, *et seq.*; Neb. Rev. Stat. § 59-1601, *et seq.*; Nev. Rev. Stat. § 598.0903, *et seq.*; N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*; N.J. Rev. Stat. § 56:8-1, *et seq.* and N.J. Rev. Stat. § 56:12-1, *et seq.*; N.M. Stat. Ann. § 57-12-1, *et seq.*; N.Y. Gen. Bus. Law § 349, *et seq.*; N.C. Gen. Stat. § 75-1.1, *et seq.*; N.D. Cent. Code § 51-15-01, *et seq.*; Okla Stat. tit. 15, § 751, *et seq.*; Or. Rev. Stat. § 646.605, *et seq.*; 73 Pa. Cons. Stat. § 201-1, *et seq.*; R.I. Gen. Laws § 6-13.1-1, *et seq.*; S.C. Code § 39-5-10, *et seq.*; S.D. Codified Laws § 37-24-1, *et seq.*; Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*; Vt. Stat. Ann. tit. 9, § 2451, *et seq.*; Va. Code Ann. § 59.1-196, *et seq.*; Wash. Rev. Code § 19.86.010, *et seq.*; Wis. Stat100.18, *et seq.*; and Wyo. Stat. Ann. § 40-12-101, *et seq.*

Lines, Plaintiff and the Class were entitled to disclosure of the defect because: (a) a significant risk of a rupture and burst, causing flooding damage, would be a material fact in a consumer's decision-making process; and (b) without Fluidmaster's disclosure, consumers would not know that there was any risk of a rupture and burst.

103. Moreover, because Fluidmaster offers only a five or ten year warranty, consumers were further entitled to know that any defect might not exhibit itself until after Fluidmaster's limited warranty expired.

104. Fluidmaster continuously and willfully failed to disclose to Plaintiff and the Class that there was a substantial risk of the NO-BURST Lines rupturing and bursting, or alternatively, that there was a substantial risk that the coupling nut of the NO-BURST would spontaneously fracture and fail.

105. Through its "NO-BURST" Braided Line name, Fluidmaster repeatedly made a false statement of material fact, which was known to each consumer who purchased these Lines due to the bold "NO-BURST" labeling attached to the Lines. Consumers reasonably relied upon the truth of the Fluidmaster labeling, and personal property damages were incurred by consumers as a result of this reliance.

106. Fluidmaster knew that if the defect to its Braided Lines was disclosed, Plaintiff and the Class would not purchase the Braided Lines. Fluidmaster intended that Plaintiff and the Class would rely on the deception by purchasing defective Braided Lines, unaware of the material facts described herein. This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

107. Plaintiff and the Class have been damaged by Fluidmaster's deception because they purchased their Braided Lines harboring an undisclosed defect that caused (or will

cause) the NO-BURST Braided Lines to eventually rupture and burst.

108. Plaintiff and Class members suffered damages when they purchased Fluidmaster products that were defective. Plaintiff was unaware of the defects at the time that his braided lines was purchased and installed in his home.

109. If Fluidmaster had disclosed the relevant facts to Plaintiff and the Class, they could have (and would have) prevented economic injury by purchasing a non-defective stainless steel-Braided Line or other type of supply line, thus avoiding the risk altogether.

110. Fluidmaster committed deceptive acts or practices within the meaning of the uniform deceptive trade practices acts by engaging in the practices alleged herein, including, without limitation, by failing to disclose the material defects concerning the Braided Lines.

111. Fluidmaster's conduct is also unfair insofar as it offends public policy; is so oppressive that the consumer has little alternative but to submit; and causes consumers substantial injury.

112. As a direct and proximate result of the unfair and deceptive acts or practices of Fluidmaster alleged herein, Plaintiff and the Class members have incurred damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

### On behalf of the Class

**113.** Plaintiff incorporates by reference each of the foregoing allegations.

114. Substantial benefits have been conferred on Fluidmaster by Plaintiff and the Class by purchasing the Braided Lines and Fluidmaster knowingly and willingly accepted

and enjoyed those benefits.

115. Fluidmaster knew or should have known that payments received from Plaintiff and the Class for the Braided Lines were paid with the expectation that they would perform as represented.

116. Fluidmaster's retention of these benefits is inequitable.

117. Plaintiff and the Class are entitled to recover from Fluidmaster all amounts wrongfully collected and improperly retained by Fluidmaster, plus interest.

118. As a direct and proximate cause of Fluidmaster's wrongful conduct and unjust enrichment, Plaintiff and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## THIRD CAUSE OF ACTION

### Negligence

### On behalf of the Class

**119.** Plaintiff incorporates by reference each of the foregoing allegations.

120. Fluidmaster was negligent in that it failed to use reasonable care when it designed, created, manufactured, assembled, labeled, tested, distributed and sold its Braided Lines.

121. As the manufacturer and/or seller of a consumer product, Fluidmaster owed a duty to Plaintiff and the Class to provide a safe and quality product, and a duty to provide a product that would perform as it was intended and expected. Fluidmaster also owed a duty to Plaintiff and the Class to provide adequate instructions and warnings for proper and safe use of the product. Fluidmaster further owed a duty to provide Plaintiff and the

Class with information related to the Braided Lines' reasonable expected life span and information related to its maintenance and replacement. Fluidmaster owed a duty to disclose to the consumer known defects that it knew existed, yet failed to do so to the detriment of the Classes. In addition, Fluidmaster had a post-sale duty to warn consumers of known defects but failed to do so.

122.  Fluidmaster breached each of these duties.

123.  As a direct and proximate result of Fluidmaster's negligence, lack of care and other wrongful acts, Plaintiff and the Class members have incurred damages in an amount to be determined at trial.

124.  As a result of Fluidmaster's negligence, Plaintiff and Class members have suffered economic losses for the damages for inadequate value, cost of repair and replacement of their defective Braided Lines, as well as damage to other personal property which resulted from a sudden and dangerous failure of the Braided Lines, causing flooding to the property of the Plaintiff and Class Members.

125. The Plaintiff and Class members' damages were proximately caused by Fluidmaster's intentional false representation of its Braided Lines as "NO-BURST" lines, even after Fluidmaster knew that the defects in the Braided Lines were causing it to burst and/or break at the coupling nut.

126.  The damages suffered by the Plaintiff and Class members were proximately caused by a negligent misrepresentation made by Fluidmaster, a corporation which is in the business of supplying information for the guidance of consumers and actively holds itself out to be "the #1 selling brand of toilet repair products in the world. . . [and] at the forefront of the toilet care market by providing innovative yet easy-to-use products that

are of the highest quality."

## FOURTH CAUSE OF ACTION

### Strict Liability -- Design Defect and Failure to Warn

### On behalf of the Class

127.  Plaintiff incorporates by reference each of the foregoing allegations.

128.  Fluidmaster designed, manufactured, sold and/or distributed defective Braided Lines to Plaintiff and the Class.

129.   The Braided Lines that Fluidmaster designed, manufactured, sold and/or distributed were defective in their design, and were defective when they left Fluidmaster's control.

130.  Fluidmaster knew, or should have known, that the Braided Lines contained a non-obvious danger in their material composition.  Fluidmaster knew that the Braided Lines were highly susceptible to failure under expected installation conditions, and that consumers would not repeatedly replace their Braided Lines without an instruction to do so.

131.  Fluidmaster knew that Plaintiff and the Classes would use the Braided Lines without first inspecting their durability.  Fluidmaster failed to inform Plaintiff and the Class as to the Braided Lines' susceptibility to sudden catastrophic failure. Fluidmaster failed to warn consumers that it was necessary to periodically inspect and replace the Braided Lines, even if the Lines had not yet failed or even if the Lines were still within the warranty period measured after the consumer's date of purchase of the Braided Line.

132.  The Braided Lines were defective due to inadequate warnings and inadequate

inspection and testing, and inadequate reporting regarding the results of quality control testing and safety inspections, or lack thereof.

133. Had Plaintiff and the Class been adequately warned concerning the likelihood that the Braided Lines would fail, they would have taken steps to avoid damages by replacing the Braided Lines or by not purchasing them.

134. Fluidmaster after learning that its NO-BURST Braided Lines could suddenly burst and or their coupling nut could fracture and break, had a post-sale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its Lines, even when used for their intended purpose.

135. As a direct and proximate result of the defective condition of the Braided Lines, Plaintiff and the Class members have incurred damages to both their Braided Lines and to their adjacent personal and real property in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Negligent Failure to Warn

### On behalf of the Class

**136.** Plaintiff incorporates by reference each of the foregoing allegations.

137. Fluidmaster manufactured, designed, sold and/or distributed defective Braided Lines to Plaintiff and the Class, and which were defective from the time that the Braided Lines were manufactured.

138. Fluidmaster knew or reasonably should have known that its Braided Lines were defective and dangerous and/or were likely to be dangerous when used in a reasonably

foreseeable and expected manner.

139. Fluidmaster knew or reasonably should have known that Plaintiff and the Class would not realize that their Braided Lines were defective and posed a danger of causing substantial property damage, both to the product itself and the adjacent real and personal property of the Plaintiff and Class.

140. Fluidmaster failed to adequately warn of the danger or instruct Plaintiff and the Class on the safe use of the Braided Lines, and further, failed to warn Plaintiff and the Class of the risks associated with signs of corrosion of the braided steel or minute fractures of the coupling nut.

141. A reasonable manufacturer, distributor, assembler, or seller under the same or similar circumstances would have warned of the dangers or instructed on the safe use of the product, including, without limitation, by providing detailed installation and maintenance instructions together with warnings to periodically inspect and/or replace the Braided Lines.

142. As a direct and proximate result of the defective condition of the Braided Lines, Plaintiff and the Class members have incurred damages in an amount to be determined at trial.

143. Fluidmaster after learning that its NO-BURST Braided Lines could suddenly burst and or their coupling nut could fracture and break, had a post-sale duty to warn consumers of the possibility that catastrophic failure and flooding could result from the failure of its Lines, even when used for their intended purpose.

144. Fluidmaster's negligent failure to warn or instruct Plaintiff and the Class was a substantial factor in causing the harm to the Plaintiff and Class, placing their safety and

personal property at risk.

## SIXTH CAUSE OF ACTION

## Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

## On behalf of the Class

145.  Plaintiff incorporates by reference each of the foregoing allegations.

146.  Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages."  10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2751 (3d ed. 1998).

147.  There is an actual controversy between Fluidmaster and Plaintiff Wyble and Class members concerning:

      a.  whether the Braided Lines are defectively designed thus causing them to fail;

      b.  whether Fluidmaster knew or should have known of the defect;

      c.  whether Fluidmaster failed to warn against the potential unsuitability of its defectively designed Braided Lines; and

      e.  whether Fluidmaster knowingly attempted to remediate the defects in its Braided Lines before Plaintiff sustained any damage and without providing notice to Plaintiff and the Class about the defects.

148.  Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

149.  Despite the repeated failures of its Braided Lines, Fluidmaster refused to acknowledge that its product is defectively designed.  Fluidmaster attempted to remediate

the defective design without advising consumers of the defect.

150.  Accordingly, based on Fluidmaster's failure to act, Plaintiff seeks a declaration that the Braided Lines are defective in their design, workmanship, material choices, and labeling, as alleged herein.  The defective nature of the Braided Lines is material and requires disclosure to all persons who own the Braided Lines.

151.  The declaratory relief requested herein will generate common answers that will settle the controversy related to the alleged defective design and labeling of the Braided Lines and the reasons for their repeated failure. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

**SEVENTH CAUSE OF ACTION**

**Arizona Breach of Express Warranty**

**On Behalf of the Arizona Class**

152.  Plaintiff Wyble realleges and incorporates the preceding paragraphs as if fully set forth herein.

153.  As fully pled above, Fluidmaster had knowledge of the defects to its Braided Lines and NO-BURST Braided Lines and that these lines pose a serious safety risk to consumers like Plaintiff Wyble and Class Members.

154. Fluidmaster expressly represented and warranted to Plaintiff Wyble and Class Members by and through oral and written statements, descriptions, and affirmations of fact through its website, print advertising, marketing materials, and even the name "NO-BURST" prominently on many of its products, that the quality of its Braided Lines was

safe and fit for their intended purposes.

155. Fluidmaster expressly represented and warranted the quality of the Braided Lines against defects in materials and workmanship for a period of either ten or five years (depending on the date of purchase of the Braided Line), promising to "replace any part of this plumbing product which proves to be defective in workmanship or materials under normal use for ten [or alternately five] years from the date of purchase."

156. Fluidmaster publicized these statements to consumers and was aware that consumers would reasonably rely on these warranties related to the quality and workmanship of the Braided Lines using statements like "Fluidmaster is quick to market, quick to manufacture and quick to deliver with *unparalleled quality assurance*" (emphasis added).

157. These express warranties were unavoidably material to the Plaintiff and Class Members who would have chosen to purchase a different product if they had prior knowledge that a sudden failure of the Braided Line would result in damage to the line itself as well as surrounding personal property of the Plaintiff and Class Members.

158. Plaintiff Wyble and Class members reasonably relied on these express warranties when they chose to purchase Fluidmaster Braided Lines and NO-BURST Braided Lines.

159. At the time that they made these express warranties, Fluidmaster knew the use for which the Braided Lines were intended, and Fluidmaster expressly warranted that the Lines were fit and safe for their intended purpose.

160. At the time that they made these express warranties, Fluidmaster knew of the latent defects in materials and workmanship inherent in the Braided Lines, but continued

to market the Braided Lines and NO-BURST Braided Lines by means of false and misleading information, including that the lines would last ten years (or alternately five years) without acknowledging or warning consumers of their actual design defects.

161. The Braided Lines purchased by Plaintiff Wyble and Class Members did not conform to Fluidmaster's promises and descriptions.

a.     The design of the Fluidmaster Braided Lines and NO-BURST Braided Lines are produced using a grade of stainless steel which is known to corrode and fracture which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. The stainless steel braiding has an unreasonably high likelihood of corroding and failing when subjected to common household chemicals that are reasonably and foreseeably used and stored near the Braided Lines.

b.     The design of the Fluidmaster Braided Lines and NO-BURST Braided Lines include low pressure inner tubing which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. This inner tubing has an unreasonably high likelihood of bursting when the stainless steel braiding covering the tubing fails.

c.     Additionally, the design of the Fluidmaster Braided Lines and NO-BURST Braided Lines includes a plastic coupling nut which is substantially certain to fail when used for its intended purpose due to Fluidmaster's choice of materials. These coupling nuts have an unreasonably high likelihood of fracturing when subjected to the daily pressures and stressors of its intended use.

162. Plaintiff Wyble and the Arizona Class members have incurred damages including but not limited to the destruction of their Braided Line, water damage to their

homes, water damage to their personal property, and loss of use of their residences during repairs as described herein as a direct and proximate result of Fluidmaster's misrepresentations in its express warranty.

### EIGHTH CAUSE OF ACTION

**Violation of Arizona Consumer Fraud Act**

**Ariz. Rev. Stat. § 44-1521, *et seq*. ("CFA")**

**On behalf of the Arizona Class**

163.  Plaintiff incorporates by reference each of the foregoing allegations.

164.  The Arizona Consumer Fraud Act ("the CFA")(Ariz. Rev. Stat. § 44-1521, *et seq*.) was in full force and effect during the relevant time period applicable to this Complaint.

165.  Plaintiff Wyble and the Arizona Class are consumers within the meaning of the CFA given that Fluidmaster's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

166.  NO-BURST Braided Lines are merchandise within the meaning of the Act. Fluidmaster is engaged in trade or commerce within the meaning of the CFA.

167.  The CFA renders unlawful "any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ."

168.  When Fluidmaster designed, developed, manufactured, marketed, and sold the Class products, it was involved in the conduct of trade and commerce under the CFA.

169. At the time Fluidmaster developed, manufactured, marketed, and sold the Braided Lines, it knew that they contained defects that pose serious safety risks to consumers like Plaintiff and Class Members.

170. Nonetheless, Fluidmaster concealed its knowledge of the defect from consumers like Plaintiff Wyble and Arizona class members and instead sold its Braided Lines as safe for normal use.

171. The defects pose serious safety risks to consumers and to their real and personal property, which were hidden from the consumers.

172. Fluidmaster intentionally concealed the unreasonable safety risks associated with the defective Braided Lines which were material facts to consumers like Plaintiff and Class Members. Indeed, no reasonable consumer would have knowingly bought a Braided Line for use if that consumer had known that the product was designed with serious defects.

173. Upon information and belief, in or around 2003 when Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating, Fluidmaster concealed this defect of the earlier design from consumers including Plaintiff Wyble and Arizona Class members, failing to remove the defective NO-BURST Braided Lines from the stream of commerce even after attempting to remediate its own design defects.

174. Upon information and belief, when Fluidmaster re-designed its acetal coupling nuts, the company concealed the earlier design defect from consumers including Plaintiff and Arizona Class members, and failed to remove the defective design from the market or to warn consumers of its design defects.

175. When it attempted to remedy some of the defects of its NO-BURST Braided Lines, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break.

176. Fluidmaster did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

177. Fluidmaster's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the CFA.

178. Fluidmaster violated the CFA not only when it sold the Braided Lines representing them to be safe and specifically represented the Lines to be "no-burst." When Fluidmaster failed to disclose to Plaintiff Wyble and the Arizona class members that the Braided Lines had multiple defects which would result in the NO-BURST Braided Lines bursting and failing despite their name and labeling. Fluidmaster's misrepresentations posed serious safety risks to consumers, their real and personal property, and to the public.

179. Fluidmaster violated the CFA when it sold a product that it knew was unsafe to use, when it held out to the public that its Braided Lines could be used safely, and when it failed to warn consumers that the Braided Lines contained defects that pose serious safety risks to consumers and the public.

180. Fluidmaster's deceptive practices, including but not limited to the NO-BURST Braided Line name and marketing of the product, were designed to induce Plaintiff and the Arizona class members to purchase the Braided Lines containing the defect and to avoid the cost of replacing, repairing or retrofitting the defective Braided Lines still being sold in retail stores and already in use by thousands of consumers throughout Arizona.

181. Fluidmaster's violations of the CFA were designed to conceal, and Fluidmaster failed to disclose, material facts about the defect and the unreasonable safety risks of the Braided Lines in order to induce Plaintiff and the Arizona class members to purchase additional Braided Lines, and in order allow Fluidmaster to avoid the cost of recalling, replacing, repairing or retrofitting the Braided Lines.

182. Plaintiff and the Arizona class members suffered injury in-fact as a direct result of Fluidmaster's violations of the CFA in that they have paid for Braided Lines that pose an immediate safety risk and will have to be repaired or replaced.

183. Had Fluidmaster disclosed the true quality, and defective nature of the Braided Lines, Plaintiff and class members would not have purchased the Braided Lines or would have paid substantially less for them.

184. Plaintiff and class members have also been denied the use of their Braided Lines, expended money on replacements, repairs, and damages to their personal property and suffered as a result of Fluidmaster's conduct.

185. To this day, Fluidmaster continues to violate the CFA by concealing the defective nature of the Braided Lines by failing to issue a recall of the NO-BURST Braided Lines, by failing to notify customers of the serious safety issues posed by the defects of these Lines, and by failing to offer replacements of their defective Braided Lines to consumers.

186. As a direct and proximate result of Fluidmaster's unfair acts or practices alleged herein, Plaintiff Wyble and Arizona class members were damaged.

**NINTH CAUSE OF ACTION**

**Arizona, Fraud by Concealment**

**On behalf of the Arizona Class**

187.   Plaintiff Wyble repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

188.   Plaintiff brings this Count on behalf of the Arizona State Class ("Class," for purposes of this Count).

189.   Fluidmaster had a duty to disclose these safety, quality, dependability, and reliability issues because Fluidmaster consistently marketed the Braided Lines as safe and "no burst."

190.   Once Fluidmaster made representations to the public about safety, quality, dependability, and reliability, Fluidmaster was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated. A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

191.  Upon information and belief, in or around 2003 when Fluidmaster changed the design of its NO-BURST Lines to incorporate an inner tubing with a higher pressure rating, Fluidmaster concealed the defect of the earlier design from consumers including Plaintiff and Arizona Class members.

192.  Upon information and belief, when Fluidmaster re-designed its acetal coupling nuts and began manufacturing the coupling nuts using glass-reinforced polypropylene, redesigning the coupling nuts to reduce the sharp transitions within the plastic coupling nut, Fluidmaster concealed the defect of the earlier design from consumers including Plaintiff and Arizona Class members.

193. When it remedied some of the defects of its NO-BURST Braided Lines, Fluidmaster failed to publicize the fact that the NO-BURST Braided Lines (which continued to be sold within its distribution networks) were known to burst and break. Fluidmaster also did not recall the defectively designed Braided Lines, nor did Fluidmaster notify property owners that the defective Braided Lines could spontaneously fail and should be replaced.

194. In addition, Fluidmaster had a duty to disclose these omitted material facts because they were known and/or accessible only to Fluidmaster, which has superior knowledge and access to the facts, and Fluidmaster knew they were not known to or reasonably discoverable by Plaintiff and the Class Members.

195. These omitted facts were material because they directly impact the safety, quality, and reliability of the NO-BURST Braided Lines. Whether a braided plumbing line is a quality and reliable product and has been manufactured and designed according to industry standards are material facts for a reasonable consumer. Fluidmaster possessed exclusive knowledge of the defects and quality control issues rendering the Braided Lines inherently more dangerous and unreliable than similar plumbing lines.

196. Fluidmaster actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Class Members to purchase Braided Lines at a higher price for the assurance of a higher quality "NO-BURST" Lines, which did not match these Braided Lines' true value.

197. Fluidmaster still has not made full and adequate disclosure and continues to defraud Plaintiff and the Class Members.

198. Plaintiff and the Class Members were unaware of these omitted material facts

and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiff's and the Class Members' actions were justified.

199. Fluidmaster was in exclusive control of the material facts, and such facts were not known to Plaintiff or the Class Members.

200. As a result of the concealment and/or suppression of the facts, Plaintiff and the Class Members sustained damage. Those Class Members who want to rescind their purchase are entitled to restitution and consequential damages to their physical and personal property which arose from the sales transaction.

201. Fluidmaster's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class Members' rights and well-being.

202. Fluidmaster's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, and Plaintiff, individually and on behalf of the Class Members, reserves the right to assert a claim for punitive damages upon satisfying the applicable statutory prerequisite pursuant to Arizona law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief, individually and on behalf of the Class:

a. an Order certifying the Class and appointing Plaintiff as the Class Representative, and appointing the undersigned counsel as Class Counsel;

b.     an award for equitable and injunctive relief enjoining Fluidmaster from continuing to pursue the policies, acts and practices described in this Complaint;

c.     an award of damages and enhanced damages under statutory and common law as alleged in this Complaint, in an amount to be determined at trial;

d.     an award of pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.     an award of reasonable attorneys' fees and reimbursement of costs incurred by Plaintiff and Plaintiff's counsel in connection with this action; and

f.     such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims set forth above.

Dated: August 16, 2014

Respectfully submitted,


By:    /s/Lance Entrekin


B. Lance Entrekin (#016172)
**The Entrekin Law Firm**
One East Camelback Road, #710
Phoenix, Arizona 85012
(602) 954-1123
E-mail: lance@entrekinlaw.com


Shanon J. Carson
Glen L. Abramson
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: scarson@bm.net
        gabramson@bm.net
(Application for Pro Hac Vice
Admission Pending)


Gregory F. Coleman
Lisa A. White
**GREG COLEMAN LAW PC**
Bank of America Center
550 Main Avenue, Suite 600
Knoxville, TN 37902
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
Email: greg@gregcolemanlaw.com
        lisa@gregcolemanlaw.com
(Application for Pro Hac Vice
Admission Pending)


Attorneys for Plaintiff and the Putative
Classes